# Exhibit A

**Harout Greg Keosian, Esq., State Bar No.: 236352**
*Email:* hgk@keosianlaw.com
**Eileen Keusseyan, Esq., State Bar No.: 149482**
*Email:* ek@keosianlaw.com
**Zareh Jack Keosian, Esq. State Bar No.: 303278**
*Email:* zjk@keosianlaw.com
**Melkon R. Melkonian, Esq., State Bar No.: 310111**
*Email:* mrm@keosianlaw.com
**KEOSIAN LAW LLP**
4630 Van Nuys Boulevard
Sherman Oaks, California 91403
Telephone: 1-818-986-9331
Facsimile: 1-818-986-9341

Electronically FILED by
Superior Court of California,
County of Los Angeles
1/12/2024 12:18 PM
David W. Slayton,
Executive Officer/Clerk of Court,
By J. Covarrubias, Deputy Clerk

Attorneys for Plaintiffs

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF LOS ANGELES

| | |
|---|---|
| HRIPSIK AGHAJANYAN, an individual; LIDA AGAKHANYAN, an individual; SERGO AIVAZOV, an individual; HOVIK AJOONIAN, an individual; OSANNA ALEBYAN, an individual; MICHAEL AINTABLIAN, an individual; VARDUHI AVETISYAN, an individual; EDGAR AZARYAN, an individual; STELLA BAGHUMYAN, an individual; JOHN BALIAN, an individual; EVAN BANALIAN, an individual; TIGRAN BARSUMYAN, an individual; MINEH BEJANIAN, an individual; ARPINE BOBIKYAN, an individual; TSOGHIK BUDOYAN, an individual; ARMAN CHALABIAN, an individual; SARKIS CHALABIAN, an individual; GAYK CHULDZHYAN, an individual; ARLETTE DANEELIAN, an individual; ROUBIK DANEELIAN, an individual; ARTHUR DARBINYAN, an individual; ANDREW DEMIRDJIAN, an individual; VAGAN DOBADZHYAN, an individual; NOREEN DZHRDZHYAN, an individual; EMIL GALSTYAN, an individual; ANAHIT GASPARYAN, an individual; TEGMINE GEVORGYAN, an individual; ARTHUR GEVORKYAN, an individual; | Case No.: 24STCV01172<br><br>**UNLIMITED CIVIL**<br><br>**COMPLAINT FOR**<br><br>1. **VIOLATION OF CALIFORNIA CIVIL CODE §§ 51 AND 52**<br>2. **VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE SECTION 17200 ET SEQ.**<br>3. **VIOLATION OF EQUAL CREDIT OPPORTUNITY ACT 15 U.S.C. § 1691 ET SEQ.**<br>4. **FRAUDULENT CONCEALMENT**<br>5. **BREACH OF CONTRACT**<br>6. **BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**<br>7. **BREACH OF FIDUCIARY DUTY**<br>8. **INTENTIONAL MISREPRESENTATION**<br>9. **NEGLIGENT MISREPRESENTATION**<br>10. **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**<br>11. **NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**<br>12. **UNJUST ENRICHMENT** |

1

COMPLAINT

| | |
|---|---|
| 1 | TIGRAN GHAZARYAN, an individual; |
| | LUSINE GHOOKASIAN, an individual; |
| 2 | KARINE GHUKASYAN, an individual; |
| | ARSALOZ GONCUOGLU, an individual; |
| 3 | SARKIS GORYAN, an individual; |
| 4 | SONA GORYAN, an individual; |
| | MARIAM GREGORY, an individual; |
| 5 | MELINA GRIGORIAN, an individual; |
| | ALEN GRIGORYAN, an individual; |
| 6 | KRISTINA GRIGORYAN, an individual; |
| 7 | TIGRAN GRIGORYAN, an individual; |
| | ALBERT HEMBARSOONIAN, an individual; |
| 8 | SAMVEL HOVHANNISYAN, an individual; |
| | ASHOT ISHKHANIAN, an individual; |
| 9 | RAFI ISSAGHOLIAN, an individual; |
| 10 | ANAHIT KARAPETYAN, an individual; |
| | KARINE KARAPETYAN, an individual; |
| 11 | ROBERT KARAPETYAN, an individual; |
| | GOHAR KAZANCHYAN, an individual; |
| 12 | AVO KAZANDJIAN, an individual; |
| | LUSINE KHACHATRYAN, an individual; |
| 13 | KLARA KHACHATOURIAN, an individual; |
| 14 | EMMA KHACHATRIAN, an individual; |
| | JOHNNY KHACHATRIAN, an individual; |
| 15 | ARTUR KHACHATRYAN, an individual; |
| | LIANA KHALATIAN, an individual; |
| 16 | VAZRIK KHODABERTI, an individual; |
| | VARTKEZ KORHONIAN, an individual; |
| 17 | JOHN KOSTIKYAN, an individual; |
| 18 | JACK KUPELIAN, an individual; |
| | VAZRIK MADADI, an individual; |
| 19 | AIDA MANUKYAN, an individual; |
| | POGOS MARTINIAN, an individual; |
| 20 | LENA MESTDJIAN, an individual; |
| 21 | NVARD MILITOYSYAN, an individual; |
| | RITA MINASSIAN, an individual; |
| 22 | ALFRED MOVSESYAN, an individual; |
| | KARAPET MNATSAKANYAN, an individual; |
| 23 | GAGIK NARINYANTS, an individual; |
| | GARNIK NAZARYAN, an individual; |
| 24 | KARAPET NAZARYAN, an individual; |
| | VARTAN NAZERIAN, an individual; |
| 25 | GRIGOR OGANESYAN, an individual; |
| 26 | ANZHELIKA OGANIAN, an individual; |
| | TALAR OUNJIAN, an individual; |
| 27 | ANNA PETROSYAN, an individual; |
| | HAYK PETROSYAN, an individual; |
| 28 | SEVAK PETROSYAN, an individual; |

**REQUEST FOR JURY TRIAL**

1   MARTIN PILOYAN, an individual;
    ARMINE POGOSIAN, an individual;
2   OFELIA POGOSIAN, an individual;
    SEDRAK POGOSYAN, an individual;
3   RANBAY CONSTRUCTION, CORP.;
4   ANAHIT RSHTUNI, an individual;
    JANET SETAGHAIAN, an individual;
5   DAVID SHAKHGELDYAN, an individual;
    ALEXANDER SHAKHNAZARYAN, an
6   individual;
7   SILVIA SHAPAGATIAN, an individual;
    KAREN SHIRINIAN, an individual;
8   GEVORK SHIRINIAN, an individual;
    ZHIRAYR SIMONYAN, an individual;
9   ELLEN STAMBULYAN, an individual;
    RAZMIK TEROVSEPIAN, an individual;
10  MISSAK TOKHMANIAN, an individual;
11  GREG TOMASYAN, an individual;
    MARINE TOUFENKCHIAN, an individual;
12  SEVAG TOULOUMDJIAN, an individual;
    LEVON LEO UTUDZHYAN, an individual;
13  SUREN VARDANYAN, an individual;
14  HASMIK YENOKYAN, an individual;
    VANIK ZARGARIAN, an individual;
15  ANNA ZARGARYAN, an individual;

16
17              Plaintiffs,

18  v.

19  CITIGROUP, INC., a Delaware Corporation;
    CITIBANK, N.A.; and DOES 1-10, inclusive,
20
21              Defendants.

22

23          Plaintiffs bring this action against Defendants CITIGROUP, INC., CITIBANK, N.A., and

24  DOES 1 to 100, inclusive, (collectively referred to as "Defendants") as follows:

25                          **JURISDICTION AND VENUE**

26          1.      This Court has jurisdiction over the entire action because Defendants are a national

27  banking corporation located in this state, and in Los Angeles County, via its numerous branches.

28  Defendants are engaged in substantial, systematic and continuous business in the State of California,

COMPLAINT

County of Los Angeles. The Los Angeles County Superior Court, therefore, has jurisdiction over this case.

2.     Venue is proper in this Court under California Code of Civil Procedure section 395(a) and (b) and California Code of Civil Procedure section 395.5. Venue is also proper because Defendants transact substantial business in this County and Defendants' discriminatory conduct alleged herein occurred in this County. Plaintiffs' injuries sustained as a result of Defendants' unlawful actions occurred in the County of Los Angeles, State of California. The venue, therefore is appropriate.

## **THE PARTIES**

3.     Plaintiffs are individuals who at all times relevant to this action resided in, the City of Los Angeles, County of Los Angeles, State of California. Plaintiffs are Armenian.

4.     Plaintiffs are informed and believe, and thereon allege, that Defendant, Citigroup, Inc. is a Delaware Corporation, headquartered in New York City, doing business in the City of Los Angeles, County of Los Angeles, State of California, where many of the incidents giving rise to this Complaint occurred.

5.     Plaintiffs are informed and believe, and thereon allege, that Defendant, Citibank, N.A. is a national bank headquartered in New York City, New York, and is a division of Citigroup, Inc., doing business in the City of Los Angeles, County of Los Angeles, State of California, where many of the incidents giving rise to this Complaint occurred.

6.     Plaintiffs are currently ignorant of the true names and capacities, whether individual, corporate, associate, or otherwise, of the Defendants sued herein under the fictitious names DOES 1 through 100, inclusive, and therefore, sues each Defendants by such fictitious names. Plaintiffs will amend this Complaint to allege the true names and capacities of said fictitiously named Defendants when their true names and capacities have been ascertained. Plaintiffs are informed and believe, and thereon allege that each of the fictitiously named DOE Defendants are legally responsible in some manner for the events and occurrences alleged herein, and for the damages suffered by Plaintiffs.

7.     Plaintiffs are informed and believe, and thereon allege that Defendants, including the fictitious DOE Defendants, were at all relevant times acting as actual agents, conspirators, ostensible

COMPLAINT

agents, partners and/or joint ventures and co-employees of all other Defendants, and that all acts alleged herein occurred within the course and scope of said agency, employment, partnership, joint venture, conspiracy, and/or enterprise, and with the express and/or implied permission, knowledge, consent, authorization and ratification of their co-Defendants.

8.     At all relevant times mentioned herein Defendant DOES 1 through 100, inclusive, were residents of and/or business entities incorporated in and/or doing business in the State of California by virtue of the laws of the State of California.

## GENERAL ALLEGATIONS

9.     Plaintiffs are informed and believe, and thereon allege, that Defendants own and/or operate a bank. Defendants are one of the largest banking, credit and lending institutions in the United States and in the State of California, with a vast network of branches and a significant market presence.

10.     Defendants' employees are not only trained to but also engage in an effort to market, advertise, and encourage consumers to apply and obtain credit-cards, credit-lines, and submit loan applications.

11.     Plaintiffs are Armenian Americans, or perceived as Armenian Americans. Stated another way, Plaintiffs are Armenian Americans, majority of whom share the commonality of last names ending in "yan" or "ian".

12.     Plaintiffs are former and/or current customers of Defendants. Plaintiffs have applied for and/or had existing accounts with Defendants.  Defendants have subjected Plaintiffs to oppressive and discriminatory practices by closing Plaintiffs' accounts and/or not extending credit to them because of their national identity.

13.     Since at least 2015 until the present, Defendants have not only deliberately but strategically engaged in discriminatory practices against individuals of Armenian American descent during the credit card application process. This discriminatory conduct transcends mere bias; it involves a systemic internal profiling of Armenian Americans, falsely associating them with a predisposition to commit fraud, with applicants being derogatorily referred to as "bad guys" or associated with organized crime.

/ / /

14.     Defendants' discriminatory acts was not an isolated incident but an established pattern or practice of Defendants to subject credit card applications from individuals of Armenian national origin to unreasonably heightened scrutiny, unjust negative assessments, and unwarranted frequent denials.

15.     On or about November 8, 2023, the Consumer Financial Protection Bureau ("CFPB") ascertained, through thorough investigation, that Defendants' personnel were trained to reject applications based on the presence of last names ending in "yan" or "ian," common suffixes in Armenian last names. This discriminatory practice also extended to applications originating from Glendale, California, where approximately 15% of the Armenian American population resides. (Attached hereto as "**Exhibit A**" is a true and correct copy of CFPB's Consent Order of November 8, 2023 incorporated herein in its entirety by reference.)

16.     Defendants deliberately and systematically employed the "yan" or "ian" identification criterion as a broad and calculated means of discriminating against Armenian Americans as a whole.

17.     Defendants did not merely subject applications with Armenian last names to heightened scrutiny; they intentionally targeted them, concealing the true reasons for the denials. Plaintiffs were unfairly singled out as more prone to fraud, labeled as "bust outs" based on the unfounded perception that they were likely to accumulate significant charges and then evade responsibility, such as leaving the country without settling the charges.

18.     The derogatory references made by Defendants, such as "Armenian bad guys" or the "Southern California Armenian Mafia," are not isolated instances but symptomatic of a pervasive discriminatory mindset within the organization.

19.     Defendants' discriminatory acts extended far beyond credit card applications; they encompassed a wide array of financial products and services, including but not limited to:

a.   Blocking access to accounts/funds;

b.   Blocking access to banking records;

c.   Closure of savings and/or checking accounts;

d.   Closure of credit card and/or lines of credit accounts;

e.   Decrease and/or lowering of credit card limits;

6
COMPLAINT

f.   Decrease and/or lowering of lines of credit limits;

g.   Denial of new credit and/or credit line increases on existing credit cards;

h.   Denial of residential and/or commercial property mortgages; and

i.   Denial of personal and/or business loan applications.

20.   Plaintiffs are informed and believe, and thereon allege, that Defendants' discriminatory practices extended into Defendants' affiliated retail credit cards. Plaintiffs found themselves rejected and denied higher credit limits and/or had their existing credit limits reduced, all without any explanation. As a result, Plaintiffs' credit scores were adversely affected.

21.   These discriminatory denials based on Armenian national origin did not occur sporadically; rather, they manifested more frequently with Plaintiffs than with similarly situated applicants, and this pattern or practice cannot be justified by any legitimate, non-discriminatory reason.

22.   Defendants unjustly stereotyped Plaintiffs as prone to criminal activities and fraud. In reality, Defendants engaged in illegal fabrication of documents to conceal their discriminatory actions.

23.   Defendants' pattern and/or practice of discrimination has not only affected Plaintiffs financially but also has had a detrimental impact on their overall well-being.

24.   Defendants were aware that their discriminatory conduct/actions violated banking laws prohibiting discrimination based on national origin. As a conscious effort to evade accountability, Defendants avoided recording decisions on phone lines or in writing.

25.   Plaintiffs are informed and believe, and thereon allege, that Defendants allowed Armenians to open bank accounts and/or credit-lines/cards and/or bank accounts at Citibank, maintaining these accounts without any delinquency issues.

26.   Later, without any justification, Defendants closed or restricted Plaintiffs' credit-lines and/or credit-cards and/or banking accounts. Some of the affected customers have an excellent financial portfolio. However, Defendants caused these accounts to be closed based solely on the customer's ancestry/ethnicity.

27.   Plaintiffs are informed and believe, and thereon allege, that Defendants' conduct was primarily because of the ethnic or ancestral background of Plaintiffs, *i.e.*, Armenians.

COMPLAINT

# FIRST CAUSE OF ACTION

## [FOR VIOLATION OF CALIFORNIA CIVIL CODE §§ 51 AND 52

## AGAINST ALL DEFENDANTS]

28.     Plaintiffs incorporate and re-allege each of the paragraphs above as though fully set forth herein.

29.     *California Civil Code* Section 51 provides that all persons within the jurisdiction of the state are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments, regardless of their race, color, religion, ancestry, national origin, sex, sexual orientation, or disability.

30.     *California Civil Code* Section 52 provides that whoever denies or interferes with the full and equal enjoyment of the rights secured by Section 51 is liable for each and every offense for the actual damages sustained by the person denied these rights.

31.     The *Unruh Civil Rights Act* (*California Civil Code* Sections 51 and 52) provides in part: "All persons within the jurisdiction of this state are free and equal, and no matter what their… ancestry, national origin… are entitled to the full and equal… advantages… privileges, or services in all business establishments of every kind whatsoever."

32.     Defendants are a "business establishment" engaged in providing credit services, financing, and banking to consumers via its hundreds of branch offices in the Los Angeles area.

33.     At all times mentioned herein, Defendants engaged in systemic, intentional, willful and purposeful discrimination against Plaintiffs solely on the basis of their ethnicity, ancestry or national origin.

34.     This systemic, intentional, willful and purposeful discrimination by Defendants against its Armenian consumers wrongfully deprived Plaintiffs of "full and equal… advantages… privileges, or services" when they obtained credit increases or financing from Defendants.

35.     Defendants' systemic, intentional, willful and purposeful discrimination against its Armenian consumers has violated the rights of Plaintiffs to be free from discrimination guaranteed by *California Civil Code* Section 51, has caused them to suffer damage, and constitutes intentional and morally offensive conduct.

36.    Under *California Civil Code* Section 52, Defendants are liable to Plaintiffs for damages and other relief resulting from Defendants' violation.

## SECOND CAUSE OF ACTION

## [FOR VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE SECTION 17200 ET SEQ. AGAINST ALL DEFENDANTS]

37.    Plaintiffs incorporate and re-allege each of the paragraphs above as though fully set forth herein.

38.    *California Business and Professions Code* Section 17200 et seq., prohibits acts that are "unlawful", and acts that constitute unfair competition, including any "unlawful, unfair or fraudulent business act or practice", and permits a cause of action to be brought against the perpetrator of any business practice that violates State law.

39.    Defendants are "persons" as defined under *California Business and Professions Code* Section 17201.

40.    Defendants' systematic policy, pattern, or practice of discrimination against Plaintiffs, as alleged herein, deprived Plaintiffs the "full and equal… advantages… privileges, or services" of Defendants, in violation of *California Civil Code* Section 51 and 52. This constitutes an unlawful business act or practice prohibited by *California Business and Professions Code* Section 17200.

41.    At all times mentioned herein, Defendants violated *California Business and Professions Code* Section 17200 et seq. by engaging in acts of unfair competition referred to herein.

42.    Plaintiffs are entitled to recover, pursuant to *California Business and Professions Code* Section 17200 et seq., in an amount according to proof at trial.

## THIRD CAUSE OF ACTION

## [FOR VIOLATION OF EQUAL CREDIT OPPORTUNITY ACT 15 U.S.C. § 1691 ET SEQ. AGAINST ALL DEFENDANTS]

43.    Plaintiffs incorporate and re-allege each of the paragraphs above as though fully set forth herein.

/ / /

/ / /

COMPLAINT

44. The Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691 et seq., prohibits creditors from discriminating against any applicant on the basis of race, color, religion, national origin, sex, marital status, or age.

45. Plaintiffs are "applicants" under 12 C.F.R. § 1002.2(e) because they requested an extension of credit from Defendants.

46. Defendants are "creditors" under 12 C.F.R. § 1002.2(e) because they regularly participate in credit decisions, including setting the terms of credit, in the ordinary course of business.

47. Defendants, by engaging in discriminatory practices against individuals of Armenian American descent, violated the ECOA by discriminating on the basis of national origin.

48. Plaintiffs each had an "adverse action" taken against them by Defendants under 12 C.F.R. § 1002.2(e) in that Defendants denied Plaintiffs' credit applications.

49. Defendants failed to provide Plaintiffs with a "statement of specific reasons for the action taken" or "a disclosure of the applicant's right to a statement of specific reasons" within thirty (30) days after receiving their credit applications.

50. Plaintiffs suffered damages as a direct and proximate result of Defendants' violation of the ECOA, in an amount according to proof at trial.

## FOURTH CAUSE OF ACTION

### [FOR FRAUDULENT CONCEALMENT AGAINST ALL DEFENDANTS]

51. Plaintiffs incorporate and re-allege each of the paragraphs above as though fully set forth herein.

52. Defendants deliberately concealed their discriminatory practices against individuals of Armenian American descent during the credit card application process.

53. Despite being aware that their actions violated banking laws prohibiting discrimination based on national origin, Defendants knowingly and intentionally failed to disclose or admit to such discriminatory practices.

54. Defendants engaged in a pattern and practice of concealing the true reasons for credit card application denials, attributing them to legitimate, non-discriminatory factors.

COMPLAINT

55.     Defendants actively fabricated documents and avoided recording decisions on phone lines or in writing to evade accountability and conceal the discriminatory nature of their actions.

56.     Defendants unjustly stereotyped Plaintiffs as prone to criminal activities and fraud while concealing their own discriminatory conduct.

57.     Plaintiffs suffered significant harm, including but not limited to financial losses, damage to creditworthiness, and emotional distress, as a direct result of Defendants' fraudulent concealment.

58.     Plaintiffs suffered significant harm, including but not limited to financial losses, as a direct and proximate result of Defendants' conduct, in an amount according to proof at trial.

## FIFTH CAUSE OF ACTION

### [FOR BREACH OF CONTRACT AGAINST ALL DEFENDANTS]

59.     Plaintiffs incorporate and re-allege each of the paragraphs above as though fully set forth herein.

60.     Defendants, by virtue of their business relationship with Plaintiffs, entered into a contract with Plaintiffs.

61.     Pursuant to the contract, Defendants were obligated to provide financial services, including credit cards, credit lines, loans, and banking services, to Plaintiffs on a non-discriminatory basis and in accordance with applicable laws.

62.     Defendants breached the contract by engaging in discriminatory practices, as detailed herein, by systematically subjecting credit card applications from individuals of Armenian national origin to heightened scrutiny, negative assessments, and frequent denials.

63.     Defendants, through their discriminatory actions, failed to fulfill their contractual obligations to Plaintiffs.

64.     Plaintiffs suffered significant harm, including but not limited to financial losses, as a direct and proximate result of Defendants' conduct, in an amount according to proof at trial.

## SIXTH CAUSE OF ACTION

### [FOR BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING AGAINST ALL DEFENDANTS]

65.     Plaintiffs incorporate and re-allege each of the paragraphs above as though fully set forth herein.

66.     In every contract, there exists an implied covenant of good faith and fair dealing that parties will not take actions that undermine or destroy the other party's right to receive the benefits of the agreement.

67.     Defendants, by virtue of their relationship with Plaintiffs as their financial institution, were subject to an implied covenant of good faith and fair dealing.

68.     Defendants breached the implied covenant by engaging in discriminatory practices, as detailed herein, systematically subjecting credit card applications from individuals of Armenian national origin to heightened scrutiny, negative assessments, and frequent denials.

69.     Defendants' discriminatory actions were not only a breach of the explicit terms of any contractual relationship but also a violation of the implied covenant of good faith and fair dealing inherent in every contractual relationship.

70.     Defendants' actions were in bad faith, oppressive, and in contravention of the fundamental principles of fair dealing.

71.     Plaintiffs suffered significant harm, including but not limited to financial losses, as a direct and proximate result of Defendants' conduct, in an amount according to proof at trial.

## SEVENTH CAUSE OF ACTION

### [FOR BREACH OF FIDUCIARY DUTY AGAINST ALL DEFENDANTS]

72.     Plaintiffs incorporate and re-allege each of the paragraphs above as though fully set forth herein.

73.     Defendants, by virtue of their relationship with Plaintiffs as their financial institution, owed Plaintiffs a fiduciary duty.

74.     This fiduciary duty included an obligation to act in the best interests of Plaintiffs, to provide services with the utmost good faith and fair dealing, and to refrain from engaging in discriminatory practices prohibited by law.

75.     Defendants breached their fiduciary duty to Plaintiffs by engaging in discriminatory practices, as detailed herein, systematically subjecting credit card applications from individuals of Armenian national origin to heightened scrutiny, negative assessments, and frequent denials.

COMPLAINT

76. Defendants, through their discriminatory actions, failed to act in the best interests of Plaintiffs and violated the duty of good faith and fair dealing inherent in the fiduciary relationship.

77. Plaintiffs suffered significant harm, including but not limited to financial losses, as a direct and proximate result of Defendants' conduct, in an amount according to proof at trial.

## EIGHTH CAUSE OF ACTION

### [FOR INTENTIONAL MISREPRESENTATION AGAINST ALL DEFENDANTS]

78. Plaintiffs incorporate and re-allege each of the paragraphs above as though fully set forth herein.

79. Defendants, through their employees, intentionally and knowingly made false representations to Plaintiffs during the credit card application process.

80. These false representations include, but are not limited to, affirmatively promoting credit card applications, credit lines, and loans to Plaintiffs while concealing a discriminatory practice of systematically subjecting credit card applications from individuals of Armenian national origin to heightened scrutiny, negative assessments, and frequent denials.

81. Defendants, with the intent to induce Plaintiffs into applying for credit cards and loans, intentionally misrepresented the terms and conditions of the application process, concealing their discriminatory practices.

82. Defendants falsely portrayed themselves as a fair and unbiased financial institution, deliberately concealing the fact that they engaged in discriminatory conduct against individuals of Armenian American descent.

83. Defendants knew or should have known that their false representations would induce Plaintiffs to rely on the accuracy of the information provided and proceed with credit card applications.

84. Plaintiffs suffered significant harm, including but not limited to financial losses, as a direct and proximate result of Defendants' conduct, in an amount according to proof at trial.

## NINTH CAUSE OF ACTION

### [FOR NEGLIGENT MISREPRESENTATION AGAINST ALL DEFENDANTS]

85. Plaintiffs incorporate and re-allege each of the paragraphs above as though fully set forth herein.

COMPLAINT

86.     Defendants, through their employees, made negligent misrepresentations to Plaintiffs during the credit card application process.

87.     These negligent misrepresentations include, but are not limited to, promoting credit card applications, credit lines, and loans to Plaintiffs while negligently failing to disclose a discriminatory practice of systematically subjecting credit card applications from individuals of Armenian national origin to heightened scrutiny, negative assessments, and frequent denials.

88.     Defendants, through their negligence, failed to provide accurate and complete information about the credit card application process, concealing their discriminatory practices.

89.     Defendants owed a duty to Plaintiffs to provide accurate and truthful information about the credit card application process, and their negligent misrepresentations constituted a breach of that duty.

90.     Defendants knew or should have known that their negligent misrepresentations would induce Plaintiffs to rely on the accuracy of the information provided and proceed with credit card applications.

91.     Plaintiffs suffered significant harm, including but not limited to financial losses, as a direct and proximate result of Defendants' conduct, in an amount according to proof at trial.

<u>**TENTH CAUSE OF ACTION**</u>

**[FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

**AGAINST ALL DEFENDANTS]**

92.     Plaintiffs incorporate and re-allege each of the paragraphs above as though fully set forth herein.

93.     Defendants, through their discriminatory practices, intentionally and recklessly inflicted severe emotional distress upon Plaintiffs.

94.     Defendants, by systematically subjecting credit card applications from individuals of Armenian national origin to heightened scrutiny, negative assessments, and frequent denials, intentionally and knowingly caused Plaintiffs to suffer severe emotional distress.

95.     Defendants' actions were extreme and outrageous, exceeding all bounds of decency in a civilized society, and were undertaken with the intent to cause severe emotional distress to Plaintiffs.

COMPLAINT

96.     Defendants derogatorily referred to Plaintiffs as "Armenian bad guys" or the "Southern California Armenian Mafia," intentionally perpetuating harmful stereotypes and causing Plaintiffs severe emotional distress.

97.     Defendants' discriminatory practices, including the unjust denial of credit, closure of accounts, and derogatory labeling, were intended to demean, humiliate, and cause emotional harm to Plaintiffs.

98.     Plaintiffs suffered severe emotional distress as a direct and proximate result of Defendants' intentional and reckless actions, including but not limited to mental suffering, distress, anxiety, sleepless nights, and fear of financial inequality.

99.     Defendants knew that their conduct would likely result in harm to Plaintiffs and that emotional distress would likely result from their conduct or gave little or no thought to the probable effect of their conduct.

100.    Plaintiffs suffered and continue to suffer severe emotional distress and Defendants' conduct was a substantial factor in causing Plaintiffs' severe emotional distress.

## ELEVENTH CAUSE OF ACTION

## [FOR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

## AGAINST ALL DEFENDANTS]

101.    Plaintiffs incorporate and re-allege each of the paragraphs above as though fully set forth herein.

102.    Defendants, by implementing a systematic policy, pattern, or practice of discrimination against Plaintiffs based on their Armenian American descent, negligently inflicted severe emotional distress upon Plaintiffs.

103.    Defendants knew or should have known that their discriminatory practices would result in severe emotional distress to Plaintiffs, yet they failed to exercise reasonable care to prevent such harm.

104.    Defendants' discriminatory conduct involved internal profiling, derogatory labeling, and unjust denial of credit, causing Plaintiffs significant emotional anguish, anxiety, and humiliation.

COMPLAINT

105.     Defendants' negligent actions were extreme and outrageous, exceeding all bounds of decency in a civilized society.

106.     Defendants' discriminatory practices were a direct and proximate cause of the severe emotional distress suffered by Plaintiffs.

### TWELFTH CAUSE OF ACTION

### [FOR UNJUST ENRICHMENT AGAINST ALL DEFENDANTS]

107.     Plaintiffs incorporate and re-allege each of the paragraphs above as though fully set forth herein.

108.     Defendants have been unjustly enriched at the expense of Plaintiffs.

109.     Plaintiffs, as customers of Defendants, reasonably expected fair and non-discriminatory treatment during the credit card application process.

110.     Despite Plaintiffs' reasonable expectations, Defendants engaged in discriminatory practices, unjustly denying credit, closing accounts, and engaging in derogatory labeling based on national origin.

111.     As a result of Defendants' unjust actions, Defendants received benefits in the form of fees, finance charges, interest, and other financial gains at the expense of Plaintiffs.

112.     Defendants' enrichment is inequitable and unjust as it was derived from discriminatory practices that harmed Plaintiffs and violated applicable laws.

113.     Plaintiffs suffered significant harm, including but not limited to financial losses, as a direct and proximate result of Defendants' conduct, in an amount according to proof at trial.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray for judgment against Defendants CITIGROUP, INC., CITIBANK, N.A., and DOES 1 to 100, inclusive, as follows:

1.     Enter judgment pursuant to *California Business and Professions Code* Section 17200 et seq. and *California Civil Code* Sections 51 and 52, declaring that the acts, policies, and practices of Defendants complained of herein are discriminatory, unlawful, unfair, and fraudulent;

2.     Pursuant to *California Civil Code* Section 52 and *California Business and Professions Code* Section 17200 et seq., grant preliminary and permanent injunctive

relief enjoining Defendants from continuing to utilize methods, policies, and practices that are discriminatory pursuant to *California Civil Code* Section 51, and have unjustified discriminatory impact on Armenian consumers, and/or are unlawful, unfair, and/or fraudulent pursuant to *California Business and Professions Code* Section 17200;

3. Order all other appropriate relief to Plaintiffs pursuant to *California Business and Professions Code* Section 17200 et seq.;

4. Order actual damages and punitive damages (up to three times the actual damages, but not less than the applicable statutory damages) to Plaintiffs pursuant to *California Civil Code* Section 51 and 52;

5. Award Plaintiffs the costs of this action, including but not limited to the fees and costs of experts, and reasonable attorneys' fees, pursuant to *California Code of Civil Procedure* Section 1021.5, *California Civil Code* Section 52(a), and/or other applicable law;

6. For restitution and disgorgement of unjust enrichment to Plaintiffs in an amount to be determined at trial;

7. For general, compensatory damages, and other damages according to proof;

8. For special and consequential damages;

9. For punitive and exemplary damages according to proof;

10. For bad faith damages;

11. For pre-judgment and post-judgment interest as provided for by applicable law; and

12. For such other and further relief as this Court finds necessary, just and proper.

DATED: January 12, 2024

**KEOSIAN LAW LLP**

By: _____

**Harout Greg Keosian, Esq.**
**Eileen Keusseyan, Esq.**
**Zareh Jack Keosian, Esq.**
**Melkon R. Melkonian, Esq.**
Attorneys for Plaintiffs

**REQUEST FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury on all of the triable issues within this Complaint.

DATED: January 12, 2024

**KEOSIAN LAW LLP**

By:

**Harout Greg Keosian, Esq.**
**Eileen Keusseyan, Esq.**
**Zareh Jack Keosian, Esq.**
**Melkon R. Melkonian, Esq.**
Attorneys for Plaintiffs

# EXHIBIT A

UNITED STATES OF AMERICA
CONSUMER FINANCIAL PROTECTION BUREAU

ADMINISTRATIVE PROCEEDING
File No. 2023-CFPB-0013

In the Matter of:

**CONSENT ORDER**

**Citibank, N.A.**

The Consumer Financial Protection Bureau (Bureau) has reviewed the practices of Citibank, N.A. (Respondent, as defined below) related to considering applications for certain private-label and co-branded consumer credit cards, and has identified the following violations of law from at least 2015 through 2021: 1) Respondent engaged in a pattern or practice of discrimination against certain applicants based on Armenian national origin in violation of the Equal Credit Opportunity Act (ECOA), 15 U.S.C. § 1691(a), and Regulation B, 12 C.F.R. §§ 1002.4(a), 1002.6(b)(1), (9); 2) Respondent failed to provide applicants with an accurate and adequate statement of the specific reasons for the adverse action when the applicant was denied based on Armenian national origin in violation of ECOA, 15 U.S.C. § 1691(d), and Regulation B, 12 C.F.R. § 1002.9(a)-(b); and

3) Respondent violated the Consumer Financial Protection Act of 2010 (CFPA) by violating ECOA, 12 U.S.C. §§ 5481(12)(D), (14), 5536(a)(1)(A), 15 U.S.C. § 1691c(b). Under §§ 1053 and 1055 of the CFPA, 12 U.S.C. §§ 5563, 5565, the Bureau issues this Consent Order (Consent Order).

## I.

## Overview

1.   From at least 2015 through 2021, it was Respondent's pattern or practice to apply extra scrutiny to, negatively assess, and often deny certain credit card applications based on Armenian national origin.

2.   Respondent employees used the applicant's last name ending in -ian or -yan, especially if the applicant's address was in or around Glendale, California, to identify for discriminatory treatment applicants they associated with Armenian national origin.

3.   Respondent employees suspected that applicants with last names ending in -ian or -yan, especially if the applicant's address was in or around Glendale, California, were more likely to commit fraud and referred to them as "bust outs" because the employees perceived them as likely to incur significant charges and then "bust out," meaning they would leave the country or otherwise not pay off the charges. Some Respondent employees referred to

these applicants as "Armenian bad guys" or the "Southern California Armenian Mafia."

4.  As a result of Respondent's pattern or practice of discrimination, Respondent more frequently denied credit to applicants based on Armenian national origin, as compared to other similarly situated applicants. Respondent's pattern or practice of discrimination is not explained by a legitimate, non-discriminatory reason.

5.  This pattern or practice of discrimination affected credit card applicants, including those seeking a new credit card or a credit line increase on an existing credit card, who were subject to manual underwriting by Respondent's Citi Retail Services unit.

## II.

## Jurisdiction

6.  The Bureau has jurisdiction over this matter under §§ 1053 and 1055 of the CFPA, 12 U.S.C. §§ 5563, 5565, and ECOA, 15 U.S.C. § 1691c(a)(9).

## III.

## Stipulation

7.  Respondent has executed a "Stipulation and Consent to the Issuance of a Consent Order," dated November 3, 2023 (Stipulation), which is

3

incorporated by reference and is accepted by the Bureau. By this Stipulation, Respondent has consented to the issuance of this Consent Order by the Bureau under §§ 1053 and 1055 of the CFPA, 12 U.S.C. §§ 5563, 5565, without admitting or denying any of the findings of fact or conclusions of law, except that Respondent admits the facts necessary to establish the Bureau's jurisdiction over Respondent and the subject matter of this action.

## IV.

### Definitions

8.  The following definitions apply to this Consent Order:

a.  "Adverse Action" means:

    i.  a refusal to grant credit in substantially the amount or on substantially the terms requested in an Application unless Respondent makes a counteroffer (to grant credit in a different amount or on other terms) and the applicant uses or expressly accepts the credit offered;

    ii.  a termination of a Credit Card account or an unfavorable change in the terms of a Credit Card account that does not affect all or substantially all of a class of Respondent's accounts; or

    iii.  a refusal to increase the amount of credit available to an applicant who has made an Application for an increase.

4

"Adverse Action" does not include:

i.    a change in the terms of an account expressly agreed to by an applicant for a Credit Card;

ii.   any action or forbearance relating to a Credit Card account taken in connection with inactivity, default, or delinquency as to that account;

iii.  a refusal or failure to authorize a Credit Card account transaction at point of sale or loan, except when the refusal is a termination or an unfavorable change in the terms of a Credit Card account that does not affect all or substantially all of a class of Respondent's Credit Card accounts, or when the refusal is a denial of an Application for an increase in the amount of credit available under the Credit Card account;

iv.   a refusal to extend credit because applicable law prohibits Respondent from extending the credit requested; or

v.    a refusal to extend credit because Respondent does not offer the type of credit or credit plan requested.

12 C.F.R. § 1002.2(c).

b.    "Affected Consumers" includes consumers who applied for a Citi Retail Services Credit Card between January 1, 2015, and December

5

31, 2021, and are identified by the Bureau as having been denied a Citi Retail Services Credit Card based on national origin discrimination.

c.  "Affiliate" means any entity that is involved in underwriting private-label or co-branded consumer credit cards that Respondent issues.

d.  "Application" means an oral or written request for an extension of credit or for an increase to the authorized credit line, including for a Credit Card or Citi Retail Services Credit Card, that is made in accordance with procedures used by Respondent for the type of credit requested. 12 C.F.R. § 1002.2(f).

e.  "Board" means Respondent's duly elected and acting Board of Directors.

f.  "Citi Retail Services" means Respondent's Retail Services business unit, and any other name by which it may be identified.

g.  "Citi Retail Services Credit Card" means a private-label or co-branded consumer credit card issued by Respondent, or Respondent's former wholly owned subsidiary Department Stores National Bank, and managed by Respondent's Retail Services business unit at any time from January 1, 2015, through December 31, 2021.

h.   "Covered Personnel" means all Respondent employees or agents with authority to approve or deny a Credit Card Application based on Judgmental Review; all Respondent employees or agents who assist or directly supervise such employees or agents, including all employees who have authority to conduct research or request information used to approve or deny a Credit Card Application; and all Respondent employees or agents whose principal job duties involve risk detection, compliance, or fraud prevention related to Credit Cards.

i.   "Credit Card" means any consumer credit card that Respondent issues, including Citi-branded, co-branded, and private-label credit cards.

j.   "Credit Transaction" means every aspect of an applicant's dealings with Respondent regarding an Application for a Credit Card or Citi Retail Services Credit Card or an extension of credit on an existing Credit Card or Citi Retail Services Credit Card, including but not limited to information requirements; investigation procedures; standards of creditworthiness; terms of credit; furnishing of credit information; revocation, alteration, or termination of credit; and collection procedures. 12 C.F.R. § 1002.2(m).

k.  "Effective Date" means the date on which the Consent Order is entered on the administrative docket.

l.  "Enforcement Director" means the Assistant Director of the Office of Enforcement for the Consumer Financial Protection Bureau, or their delegate.

m.  "Judgmental Review" or "Judgmentally Reviewed" means the process by which a Citi employee or agent manually underwrites a Credit Card Application and approves, denies, or otherwise makes a credit decision.

n.  "Related Consumer Action" means a private action by or on behalf of one or more consumers or an enforcement action by another governmental agency brought against Respondent based on substantially the same facts as described in Section V of this Consent Order.

o.  "Relevant Period" includes from January 1, 2015, through December 31, 2021.

p.  "Respondent" means Citibank, N.A. and its successors and assigns.

q.  "Supervision Director" means the Assistant Director of the Office of Supervision Policy for the Consumer Financial Protection Bureau, or their delegate.

## V.

### Bureau Findings and Conclusions

The Bureau finds the following:

9.    Respondent is a national bank headquartered in New York, New York.

10.   As of June 30, 2023, Respondent had $1.7 trillion in total assets.

11.   Respondent is an insured depository institution with assets greater than $10,000,000,000 within the meaning of 12 U.S.C. § 5515(a).

12.   Respondent is a "covered person" under 12 U.S.C. § 5481(6).

13.   During the Relevant Period, Respondent issued Citi-branded, co-branded, and private-label credit cards.

14.   Respondent is a creditor within the meaning of ECOA, 15 U.S.C. § 1691a(e), and Regulation B, 12 C.F.R. § 1002.2(*l*).

### Findings and Conclusions as to Respondent's Pattern or Practice of Discrimination in Violation of ECOA

15.   Since at least 2015 through 2021, Respondent employees charged with Judgmental Review of Citi Retail Services Credit Card Applications routinely applied extra scrutiny to, negatively assessed, and often denied Applications if the applicant's last name ended in -ian or -yan, especially if the applicant's address was in or around Glendale, California.

16.    Respondent employees considered whether the applicant's last name ended in -ian or -yan, especially if the applicant's address was in or around Glendale, California, in order to identify Applications submitted by an applicant of perceived Armenian national origin.

17.    Respondent employees considered applicants with last names ending in -ian or -yan, especially if the applicant's address was in or around Glendale, California, as presenting a high risk of fraud, including because they were perceived as likely to incur significant charges and then "bust out," meaning they would leave the country or otherwise not pay off the charges.

18.    Respondent employees took actions that negatively affected applicants for Citi Retail Services Credit Cards and credit line increases with a last name ending in -ian or -yan, especially if their address was in or around Glendale, California, including:

   a.    denying the Application, or approving credit on less favorable terms;

   b.    applying additional scrutiny to the Application, including requiring further information from the applicant such as verification of their income or assets;

   c.    placing a block or a hold on the applicant's account; and

    d.    referring the applicant to Respondent's fraud prevention units for further review and a potential account freeze, line decrease, or account closure.

19.    Respondent took corrective action against employees if they failed to identify and deny Applications if the applicant's last name ended in -ian or -yan and address was in or around Glendale, California, including action that could affect the agent's performance rating, pay, and authority to approve future Citi Retail Services Credit Card Applications.

20.    Respondent supervisors and trainers instructed Respondent employees to conceal their reliance in the credit decision on applicants' last names ending in -ian or -yan and addresses in or around Glendale, California, including by telling Respondent employees not to discuss it in writing or on recorded phone lines.

21.    Statistical regression analyses of Citi Retail Services Credit Card data from 2015 through 2021 for Applications referred for Judgmental Review show that Respondent denied Citi Retail Services Credit Card Applications from applicants with a last name ending in -ian or -yan more often than other similarly situated applicants, especially if the applicant also had an address in or around Glendale, California. These national-origin-based disparities in

underwriting Citi Retail Services Credit Cards are statistically significant, meaning they are highly unlikely to have occurred by chance.

22.    Respondent did not have a legitimate, non-discriminatory explanation for its pattern or practice of applying extra scrutiny to, negatively assessing, and often denying Applications for Citi Retail Services Credit Cards if the applicant's last name ended in -ian or -yan or address was in or around Glendale, California, and to the extent that Respondent identified purportedly legitimate, non-discriminatory reasons for denying such Applications, those reasons were pretextual justifications for denying the Applications based on the national origin Respondent attributed to the applicant.

23.    Respondent's pattern or practice described in this Section discriminated against Citi Retail Services Credit Card applicants in multiple aspects of the Credit Transaction on the basis of national origin in violation of ECOA, 15 U.S.C. § 1691(a)(1), and Regulation B, 12 C.F.R. §§ 1002.4(a), 1002.6.

**Findings and Conclusions as to Respondent's Failure to Provide Accurate and Adequate Adverse Action Notices in Violation of ECOA**

24.    When Respondent denied a Citi Retail Services Credit Card Application based on the applicant's Armenian national origin, Respondent failed to inform the applicant accurately and adequately of the reason for the action in

12

the adverse action notice as required by 15 U.S.C. § 1691(d) and 12 C.F.R.
§ 1002.9(a)-(b).

25.    For example, in 2016, a Citi employee with authority to approve or deny Citi
Retail Services Credit Card Applications messaged another employee, "it's
been a while since I declined for possible credit abuse/YAN—gimme some
reasons I can use, or do I need to not worry about it?" The other employee
responded with several apparently pretextual reasons the first employee
could use. Just one second later, the first employee replied that the
application was "declined due to possible credit abuse."

26.    This practice persisted even after concerns about denying applicants based
on an address in Glendale were raised by Citi employees. For example, in
2018, a Citi employee sent an email to a group manager of Citi Retail
Services and others, asking for advice about how to document adverse action
reasons, stating "we can't tell [customers they are being declined] because
they are in Glendale."

27.    Respondent therefore failed to provide a legally compliant statement of the
specific reasons for the adverse action that Respondent took against Citi
Retail Services Credit Card applicants who it denied based on their
Armenian national origin, in violation of ECOA, 15 U.S.C. § 1691(d), and
Regulation B, 12 C.F.R. § 1002.9(a)-(b).

13

**Findings and Conclusions as to Respondent's Violations of the CFPA by its Violations of ECOA**

28.   Respondent's ECOA violations described in Section V also constitute violations of § 1036(a)(1)(A) of the CFPA, 12 U.S.C. §§ 5481(12)(D), (14), 5536(a)(1)(A); 15 U.S.C. § 1691c(b).

## VI.

## Conduct Provisions

### Prohibited Conduct

**IT IS ORDERED**, under §§ 1053 and 1055 of the CFPA, that:

29.   Respondent and its officers, agents, servants, employees, and attorneys, and all other persons in active concert or participation with them who receive actual notice of this Consent Order, whether acting directly or indirectly, in connection with offering and providing Credit Cards, may not violate ECOA, 15 U.S.C. § 1691(a), (d), and Regulation B, 12 C.F.R. §§ 1002.4(a), 1002.6(b)(1), (9), 1002.9(a)-(b), and are prohibited from:

   a.   engaging in unlawful discrimination in any aspect of the Credit Transaction; and

   b.   failing to provide an accurate and adequate statement of the specific reasons for Adverse Actions taken on Credit Card Applications.

**Affirmative Requirements**

**IT IS ORDERED**, under §§ 1053 and 1055 of the CFPA, that:

30.     Respondent must take the following affirmative actions in connection with offering and providing Credit Cards:

    a.     establish, implement, and maintain a compliance management system that is reasonably designed to ensure that Respondent's operations comply with ECOA, 15 U.S.C. § 1691(a), (d), and Regulation B, 12 C.F.R. §§ 1002.4(a), 1002.6(b)(1), (9), 1002.9(a)-(b); and

    b.     establish, implement, and maintain policies and procedures to ensure that Respondent's offering and provision of Credit Cards, including its underwriting, account management, risk detection, fraud prevention, and Adverse Action policies and practices, comport with ECOA, 15 U.S.C. § 1691(a), (d), and Regulation B, 12 C.F.R. §§ 1002.4(a), 1002.6(b)(1), (9), 1002.9(a)-(b).

## VII.

### Compliance Plan

**IT IS FURTHER ORDERED** that:

31.     Within 60 days of the Effective Date, Respondent must create and implement a comprehensive compliance plan designed to ensure that Respondent's offering and provision of Credit Cards comply with ECOA,

15 U.S.C. § 1691(a), (d), and Regulation B, 12 C.F.R. §§ 1002.4(a),
1002.6(b)(1), (9), 1002.9(a)-(b), and the terms of this Consent Order
(Compliance Plan). The Compliance Plan must include, at a minimum:

a.   detailed steps for addressing each action required by this Consent
     Order;

b.   a mechanism to ensure that the Board is kept apprised of the status of
     all compliance actions;

c.   monitoring of communications and training materials about
     Judgmental Review of Credit Card Applications to ensure that
     Respondent employees and agents do not consider characteristics or
     information prohibited by ECOA, 15 U.S.C. § 1691(a), and
     Regulation B, 12 C.F.R. §§ 1002.4(a), 1002.6(b)(1), (9), including at a
     minimum monitoring of written and oral communications of
     Respondent employees or agents with authority to approve or deny a
     Credit Card Application based on Judgmental Review, and all
     Respondent employees or agents who assist or directly supervise such
     employees or agents, including all employees who have authority to
     conduct research or request information used to approve or deny a
     Credit Card Application;

d.    periodic, but no less than annual, portfolio-wide statistical analysis of

credit decision data for Judgmentally Reviewed Credit Card

Applications designed to detect discrimination on a prohibited basis in

violation of ECOA, 15 U.S.C. § 1691(a), and Regulation B, 12 C.F.R.

§§ 1002.4(a), 1002.6(b)(1), (9), including at a minimum analysis

designed to detect the discrimination identified in Section V and any

additional analysis based on the results of Respondent's monitoring

pursuant to Paragraph 31(c);

e.    to the extent that the monitoring or periodic analysis set forth in

Paragraph 31(c)-(d) identifies potential discrimination on a prohibited

basis in violation of ECOA, 15 U.S.C. § 1691(a), and Regulation B,

12 C.F.R. §§ 1002.4(a), 1002.6(b)(1), (9), within 60 days Respondent

must take additional action to identify the root cause of the potential

discrimination and take any necessary corrective action, which may

include but is not limited to remunerating affected consumers,

extending credit that was previously denied, correcting inaccurate or

inadequate Adverse Action notices, correcting any inaccurate

consumer reporting, and taking any necessary personnel action;

f.    periodic, but no less than quarterly, reporting of Respondent's actions

under Paragraph 31(e), including all instances in which Respondent

17

identified potential discrimination in violation of ECOA and
Regulation B, a detailed description of the potentially affected
population, Respondent's determination of the root cause of the
potential discrimination, and all corrective action taken;

g.    periodic, but no less than annual, training for all Covered Personnel
on the requirements of ECOA and Regulation B, and the findings and
requirements of this Consent Order, including but not limited to the
requirements of 15 U.S.C. § 1691(a), (d), and Regulation B, 12 C.F.R.
§§ 1002.4(a), 1002.6(b)(1), (9), 1002.9(a)-(b);

h.    a mechanism to ensure that any Affiliate conducts periodic, but no
less than annual, training of all Affiliate personnel with authority to
make credit decisions on Respondent Credit Cards. This training must
cover the requirements described in Paragraph 31(g); and

i.    specific timeframes and deadlines for implementation of the steps
described above, including to ensure that any new Covered Personnel
or other personnel subject to the training requirements in Paragraph
31(g)-(h) receives that training within 30 days of beginning
employment in the position requiring such training.

32.    Respondent will provide the Compliance Plan to the Bureau within 60 days
of the Effective Date.

## VIII.

## Role of the Board and Executives

**IT IS FURTHER ORDERED** that:

33.   Respondent's Board has the ultimate responsibility for ensuring that Respondent complies with this Consent Order.

34.   Respondent's Chief Executive Officer and the Board must review all plans and reports required by this Consent Order, and any submissions to the Bureau prior to such submission.

35.   One year after the Effective Date, Respondent must submit to the Supervision Director an accurate written compliance progress report (Compliance Report) that has been approved by the Board, the accuracy of which is sworn to under penalty of perjury, and which, at a minimum:

   a.   describes the steps that Respondent's Board and Chief Executive Officer have taken to reasonably assess whether Respondent is complying with the Redress Plan, Compliance Plan, and each applicable paragraph and subparagraph of the Consent Order;

   b.   describes in detail whether and how Respondent has complied with the Redress Plan, Compliance Plan, and each applicable paragraph and subparagraph of the Consent Order, including the manner of verification of such compliance and any corrective actions taken to

19

remedy potential non-compliance with the applicable requirement, paragraph, or subparagraph; and

c.    attaches a copy of each Order Acknowledgment obtained under Section XIII, unless previously submitted to the Bureau.

36.    Respondent's Board and Chief Executive Officer must:

a.    authorize whatever actions are necessary for Respondent to assess whether Respondent is complying with the Redress Plan, Compliance Plan, and each applicable paragraph and subparagraph of the Consent Order;

b.    authorize whatever actions, including corrective actions, are necessary for Respondent to fully comply with the Redress Plan, Compliance Plan, and each applicable paragraph and subparagraph of the Consent Order; and

c.    require timely reporting by management to the Board and Respondent's Chief Executive Officer on the status of compliance obligations.

# MONETARY PROVISIONS

## IX.

## Order to Pay Redress

**IT IS FURTHER ORDERED** that:

37.    Within 10 days of the Effective Date, Respondent must reserve or deposit into a segregated deposit account $1,400,000, for the purpose of providing redress to Affected Consumers as required by this Section.

38.    Within 45 days of the Effective Date, Respondent must submit to the Enforcement Director for review and non-objection a comprehensive written plan for providing redress consistent with this Consent Order (Redress Plan). The Enforcement Director will have the discretion to make a determination of non-objection to the Redress Plan or direct Respondent to revise it. If the Enforcement Director directs Respondent to revise the Redress Plan, Respondent must revise and resubmit the Redress Plan to the Enforcement Director within 15 days. After receiving notification that the Enforcement Director has made a determination of non-objection to the Redress Plan, Respondent must implement and adhere to the steps, recommendations, deadlines, and timeframes outlined in the Redress Plan.

39.   The Redress Plan must:

    a.   describe how Respondent proposes to remediate Affected Consumers, including how Respondent proposes to identify current mailing addresses and any other effective means for contacting Affected Consumers, which must include, at a minimum, reasonable efforts to identify current addresses prior to mailing redress checks or notification letters and upon receipt of any redress checks or notification letters that are returned as undeliverable;

    b.   specify that Respondent will pay Affected Consumers by direct deposit whenever feasible and otherwise reimburse Affected Consumers by paper check;

    c.   specify that Respondent will provide a notification to Affected Consumers:

        i.   explaining that Respondent's redress payment is based on the Affected Consumer being identified by the Bureau as subject to discrimination based on Armenian national origin and is made in accordance with the terms of this Consent Order;

        ii.   identifying dedicated Respondent contact information (at least telephone and email) for questions about redress; and

        iii.   include an exemplar of this notification letter;

Case 2:24-cv-02992-MWF-E   Document 1-1   Filed 04/12/24   Page 43 of 58   Page ID #:52

2023-CFPB-0013   Document 1   Filed 11/08/2023   Page 23 of 36

    d.      specify a methodology for identifying Affected Consumers who engaged in cases of documented fraud on Respondent, for the purpose of excluding such consumers from the remediation set forth in this Section; and

    e.      in the event that redress to Affected Consumers is less than the amount identified in Paragraph 37, specify a method for providing alternative consumer redress to satisfy Respondent's obligations to pay the redress amount identified in Paragraph 37.

40.    Within 30 days of completing the Redress Plan, Respondent must submit to the Bureau a Redress Report detailing the number of consumers and consumer accounts who received redress, the total amount of redress paid to those consumers, and any remainder of funds to be wired to the Bureau pursuant to Paragraph 41.

41.    After completing the Redress Plan, if the amount of redress provided to Affected Consumers is less than the amount identified in Paragraph 37, within 30 days of the completion of the Redress Plan, Respondent must pay to the Bureau, by wire transfer to the Bureau or to the Bureau's agent, and according to the Bureau's wiring instructions, the difference between the amount of redress provided to Affected Consumers and the amount identified in Paragraph 37.

23

42.     The Bureau may use these remaining funds to pay additional redress to

Affected Consumers. If the Bureau determines, in its sole discretion, that

additional redress is wholly or partially impracticable or otherwise

inappropriate, or if funds remain after the additional redress is completed,

the Bureau will deposit any remaining funds in the U.S. Treasury.

Respondent will have no right to challenge any actions that the Bureau or its

representatives may take under this Section.

43.     Respondent may not condition the payment of any redress to any Affected

Consumer under this Consent Order on that Affected Consumer waiving any

right.

## X.

## Order to Pay Civil Money Penalty

**IT IS FURTHER ORDERED** that:

44.     Under § 1055(c) of the CFPA, 12 U.S.C. § 5565(c), by reason of the

violations of law described in Section V of this Consent Order, Respondent

must pay a civil money penalty of $24,500,000 to the Bureau.

45.     Within 10 days of the Effective Date, Respondent must pay the civil money

penalty by wire transfer to the Bureau or to the Bureau's agent in

compliance with the Bureau's wiring instructions.

46.   The civil money penalty paid under this Consent Order will be deposited in the Civil Penalty Fund of the Bureau as required by § 1017(d) of the CFPA, 12 U.S.C. § 5497(d).

47.   Respondent, for all purposes, must treat the civil money penalty paid under this Consent Order as a penalty paid to the government. Regardless of how the Bureau ultimately uses those funds, Respondent may not:

   a.   claim, assert, or apply for a tax deduction, tax credit, or any other tax benefit for any civil money penalty paid under this Consent Order; or

   b.   seek or accept, directly or indirectly, reimbursement or indemnification from any source, including but not limited to payment made under any insurance policy, with regard to any civil money penalty paid under this Consent Order.

48.   To preserve the deterrent effect of the civil money penalty in any Related Consumer Action, Respondent may not argue that Respondent is entitled to, nor may Respondent benefit by, any offset or reduction of any compensatory monetary remedies imposed in the Related Consumer Action because of the civil money penalty paid in this action or because of any payment that the Bureau makes from the Civil Penalty Fund. If the court in any Related Consumer Action offsets or otherwise reduces the amount of compensatory monetary remedies imposed against Respondent based on the civil money

25

penalty paid in this action or based on any payment that the Bureau makes from the Civil Penalty Fund, Respondent must, within 30 days after entry of a final order granting such offset or reduction, notify the Bureau, and pay the amount of the offset or reduction to the U.S. Treasury. Such a payment will not be considered an additional civil money penalty and will not change the amount of the civil money penalty imposed in this action.

## XI.

### Additional Monetary Provisions

**IT IS FURTHER ORDERED** that:

49.   In the event of any default on Respondent's obligations to make payment under this Consent Order, interest, computed under 28 U.S.C. § 1961, as amended, will accrue on any outstanding amounts not paid from the date of default to the date of payment, and will immediately become due and payable.

50.   Respondent must relinquish all dominion, control, and title to the funds paid to the fullest extent permitted by law and no part of the funds may be returned to Respondent.

51.   Respondent acknowledges that its Taxpayer Identification Number (Employer Identification Number), which Respondent previously submitted to the Bureau, may be used for collecting and reporting on any delinquent

amount arising out of this Consent Order, in accordance with 31 U.S.C. § 7701.

52.    Within 30 days of the entry of a final judgment, consent order, or settlement in a Related Consumer Action, Respondent must notify the Supervision Director and Enforcement Director of the final judgment, consent order, or settlement in writing. That notification must indicate the amount of redress, if any, that Respondent paid or is required to pay to consumers and describe the consumers or classes of consumers to whom that redress has been or will be paid.

## COMPLIANCE PROVISIONS

## XII.

### Reporting Requirements

**IT IS FURTHER ORDERED** that:

53.    Respondent must notify the Bureau of any development that may affect compliance obligations arising under this Consent Order, including but not limited to a dissolution, assignment, sale, merger, or other action that would result in the emergence of a successor company; the creation or dissolution of a subsidiary, parent, or affiliate that engages in any acts or practices subject to this Consent Order; the filing of any bankruptcy or insolvency

27

proceeding by or against Respondent; any change to Citi Retail Services or its Credit Card portfolio that would materially affect Respondent's compliance obligations under Paragraph 31 of this Consent Order; or a change in Respondent's name or address. Respondent must provide this notice, if practicable, at least 30 days before the development, but in any case no later than 14 days after the development.

54. Within 7 days of the Effective Date, Respondent must:

    a.    designate at least one telephone number and email, physical, and postal addresses as points of contact that the Bureau may use to communicate with Respondent; and

    b.    designate at least one telephone number and email, physical, and postal addresses as points of contact for consumers with inquiries related to consumer relief under the Consent Order.

55. Respondent must report any change in the information required to be submitted under Paragraph 54 at least 30 days before the change or as soon as practicable after learning about the change, whichever is sooner.

### XIII.

### Order Distribution and Acknowledgment

**IT IS FURTHER ORDERED** that:

28

56. Within 7 days of the Effective Date, Respondent must submit to the Supervision Director an acknowledgment of receipt of this Consent Order, sworn under penalty of perjury.

57. Within 30 days of the Effective Date, Respondent must deliver a copy of this Consent Order to each of its Board members and executive officers, as well as to any managers, employees, service providers, or other agents and representatives who have responsibilities related to the subject matter of the Consent Order.

58. For 5 years from the Effective Date, Respondent must deliver a copy of this Consent Order to any business entity resulting from any change in structure referred to in Section XII, any future Board members and executive officers, as well as to any managers, employees, service providers, or other agents and representatives who will have responsibilities related to the subject matter of the Consent Order before they assume their responsibilities.

59. Respondent must secure a signed and dated statement acknowledging receipt of a copy of this Consent Order, within 30 days of delivery, from all persons receiving a copy of this Consent Order under this Section.

60. Within 90 days from the Effective Date, Respondent must submit to the Bureau a list of all persons and their titles to whom this Consent Order has been delivered under the Section of this Consent Order titled "Order

Distribution and Acknowledgment" and a copy of all signed and dated

statements acknowledging receipt of this Consent Order under Paragraph 59.

## XIV.

## Recordkeeping

**IT IS FURTHER ORDERED** that:

61. Respondent must create and retain the following business records:

  a.   all documents and records necessary to demonstrate full compliance
       with the Compliance Plan, Redress Plan, and each provision of this
       Consent Order, including all submissions to the Bureau; and

  b.   all documents and records pertaining to the Redress Plan, Compliance
       Plan, and other requirements of this Consent Order.

62. All documents and records must be maintained in their original electronic
    format. Data should be centralized, and maintained in such a way that
    access, retrieval, auditing, and production are not hindered.

63. Respondent must make the documents identified in Paragraph 61 available
    to the Bureau upon the Bureau's request.

## XV.

## Notices

**IT IS FURTHER ORDERED** that:

64. Unless otherwise directed in writing by the Bureau, Respondent must provide all submissions, requests, communications, or other documents relating to this Consent Order in writing, with the subject line, "*In re Citibank, N.A.*, File No. 2023-CFPB-0013," and send them to the following email: Enforcement_Compliance@cfpb.gov addressed as follows:

> ATTN: Supervision Director
> Consumer Financial Protection Bureau
> Office of Supervision Policy

> ATTN: Enforcement Director
> Consumer Financial Protection Bureau
> Office of Enforcement

## XVI.

### Cooperation with the Bureau

**IT IS FURTHER ORDERED** that:

65. Respondent must cooperate fully to help the Bureau determine the identity and location of, and the amount of injury sustained by, each Affected Consumer. Respondent must provide such information in its or its agents' possession or control within 14 days of receiving a written request from the Bureau.

# XVII.

## Compliance Monitoring

**IT IS FURTHER ORDERED** that:

66. Within 14 days of receipt of a written request from the Bureau, Respondent must submit additional Compliance Reports or other requested information, which must be made under penalty of perjury; provide sworn testimony; or produce documents.

67. Respondent must permit Bureau representatives to interview any employee or other person affiliated with Respondent who has agreed to such an interview regarding: (a) this matter; (b) anything related to or associated with the conduct described in Section V; or (c) compliance with the Consent Order. The person interviewed may have counsel present.

68. Nothing in this Consent Order will limit the Bureau's lawful use of civil investigative demands under 12 C.F.R. § 1080.6 or other compulsory process.

# XVIII.

## Modifications to Non-Material Requirements

**IT IS FURTHER ORDERED** that:

69. Respondent may seek a modification to non-material requirements of this Consent Order (*e.g.*, reasonable extensions of time and changes to reporting requirements) by submitting a written request to the Supervision Director or Enforcement Director.

70. The Supervision Director or Enforcement Director may, in their discretion, modify any non-material requirements of this Consent Order (*e.g.*, reasonable extensions of time and changes to reporting requirements) if they determine good cause justifies the modification. Any such modification by the Supervision Director or Enforcement Director must be in writing.

## XIX.

## ADMINISTRATIVE PROVISIONS

**IT IS FURTHER ORDERED** that:

71. The provisions of this Consent Order do not bar, estop, or otherwise prevent the Bureau from taking any other action against Respondent, except as described in Paragraph 72. Further, for the avoidance of doubt, the provisions of this Consent Order do not bar, estop, or otherwise prevent any other person or governmental agency from taking any action against Respondent.

72. The Bureau releases and discharges Respondent from all potential liability for law violations that the Bureau has or might have asserted based on the

practices described in Section V of this Consent Order, to the extent such practices occurred before the Effective Date and the Bureau knows about them as of the Effective Date. The Bureau may use the practices described in this Consent Order in future enforcement actions against Respondent and its affiliates, including, without limitation, to establish a pattern or practice of violations or the continuation of a pattern or practice of violations or to calculate the amount of any penalty. This release does not preclude or affect any right of the Bureau to determine and ensure compliance with the Consent Order, or to seek penalties for any violations of the Consent Order.

73. This Consent Order is intended to be, and will be construed as, a final Consent Order issued under § 1053 of the CFPA, 12 U.S.C. § 5563, and expressly does not form, and may not be construed to form, a contract binding the Bureau or the United States.

74. This Consent Order will terminate on the later of 5 years from the Effective Date or 5 years from the most recent date that the Bureau initiates an action alleging any violation of the Consent Order by Respondent if such action is initiated within 5 years of the Effective Date. If such action is dismissed or the relevant adjudicative body rules that Respondent did not violate any provision of the Consent Order, and the dismissal or ruling is either not appealed or upheld on appeal, then the Consent Order will terminate as

though the action had never been filed. The Consent Order will remain effective and enforceable until such time, except to the extent that any provisions of this Consent Order have been amended, suspended, waived, or terminated in writing by the Bureau or its designated agent.

75. Calculation of time limitations will run from the Effective Date and be based on calendar days, unless otherwise noted.

76. Should Respondent seek to transfer or assign all or part of its operations that are subject to this Consent Order, Respondent must, as a condition of sale, obtain the written agreement of the transferee or assignee to comply with all applicable provisions of this Consent Order.

77. The provisions of this Consent Order will be enforceable by the Bureau. For any violation of this Consent Order, the Bureau may impose the maximum amount of civil money penalties allowed under §1055(c) of the CFPA, 12 U.S.C. § 5565(c). In connection with any attempt by the Bureau to enforce this Consent Order in federal district court, the Bureau may serve Respondent wherever Respondent may be found and Respondent may not contest that court's personal jurisdiction over Respondent.

78. This Consent Order and the accompanying Stipulation contain the complete agreement between the parties. The parties have made no promises, representations, or warranties other than what is contained in this Consent

Order and the accompanying Stipulation. This Consent Order and the accompanying Stipulation supersede any prior oral or written communications, discussions, or understandings.

79.  Nothing in this Consent Order or the accompanying Stipulation may be construed as allowing Respondent, its Board, its executives, officers, or employees to violate any law, rule, or regulation.

**IT IS SO ORDERED**, this 7th day of November, 2023.

*Rohit Chopra*

Rohit Chopra
Director
Consumer Financial Protection Bureau

36

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

| |
|---|
| **NOTICE TO DEFENDANT:**<br>*(AVISO AL DEMANDADO):*<br><br>CITIGROUP, INC., a Delaware Corporation; CITIBANK, N.A.; and<br>DOES 1-10, inclusive,<br><br>**YOU ARE BEING SUED BY PLAINTIFF:**<br>*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*<br><br>HRIPSIK AGHAJANYAN, an individual; LIDA AGAKHANYAN, an<br>individual; (See Additional Parties Attachment) | *FOR COURT USE ONLY*<br>*(SOLO PARA USO DE LA CORTE)*<br><br>**Electronically FILED by<br>Superior Court of California,<br>County of Los Angeles<br>1/17/2024 3:34 PM<br>David W. Slayton,<br>Executive Officer/Clerk of Court,<br>By J. Covarrubias, Deputy Clerk** |

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is:<br>*(El nombre y dirección de la corte es):* Superior Court of the State of California<br><br>Stanley Mosk Courthouse<br>111 North Hill Street; Los Angeles, Ca 90012 | CASE NUMBER:<br>*(Número del Caso):*<br><br>24STCV01172 |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Harout Keosian, Esq., 4630 Van Nuys Blvd. Sherman Oaks, CA 91403; Tel. 818 986 9331

David W. Slayton, Executive Officer/Clerk of Court

| | | |
|---|---|---|
| DATE: 01/17/2024<br>*(Fecha)* | Clerk, by<br>*(Secretario)* J. Covarrubias | , Deputy<br>*(Adjunto)* |

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

[SEAL]

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*

   under: ☐ CCP 416.10 (corporation)      ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)      ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)

   ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

**Page 1 of 1**

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| Hripsik Aghajanyan, et al. vs. Citigroup Inc, et al. | 24STCV01172 |

## INSTRUCTIONS FOR USE

➡ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.
➡ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

**List additional parties** *(Check only one box. Use a separate page for each type of party):*

[✓] Plaintiff    [ ] Defendant    [ ] Cross-Complainant    [ ] Cross-Defendant

SERGO AIVAZOV, an individual;HOVIK AJOONIAN, an individual;OSANNA ALEBYAN, an individual;
MICHAEL AINTABLIAN, an individual;VARDUHI AVETISYAN, an individual;EDGAR AZARYAN, an
individual;VANIK ZARGARIAN, an individual;ANNA ZARGARYAN, an individual;
STELLA BAGHUMYAN, an individual;JOHN BALIAN, an individual;EVAN BANALIAN, an individual;
TIGRAN BARSUMYAN, an individual;MINEH BEJANIAN, an individual;ARPINE BOBIKYAN, an
individual;TSOGHIK BUDOYAN, an individual;ARMAN CHALABIAN, an individual;SARKIS
CHALABIAN, an individual;GAYK CHULDZHYAN, an individual;ARLETTE DANEELIAN, an individual;
ROUBIK DANEELIAN, an individual;ARTHUR DARBINYAN, an individual;ANDREW DEMIRDJIAN, an
individual;VAGAN DOBADZHYAN, an individual;NOREEN DZHRDZHYAN, an individual;EMIL
GALSTYAN, an individual;ANAHIT GASPARYAN, an individual;TEGMINE GEVORGYAN, an individual;
ARTHUR GEVORKYAN, an individual;TIGRAN GHAZARYAN, an individual;LUSINE GHOOKASIAN,
an individual;KARINE GHUKASYAN, an individual;ARSALOZ GONCUOGLU, an individual;SARKIS
GORYAN, an individual;SONA GORYAN, an individual;MARIAM GREGORY, an individual;MELINA
GRIGORIAN, an individual;ALEN GRIGORYAN, an individual;KRISTINA GRIGORYAN, an individual;
TIGRAN GRIGORYAN, an individual;ALBERT HEMBARSOONIAN, an individual;SAMVEL
HOVHANNISYAN, an individual;ASHOT ISHKHANIAN, an individual;RAFI ISSAGHOLIAN, an
individual;ANAHIT KARAPETYAN, an individual;KARINE KARAPETYAN, an individual;ROBERT
KARAPETYAN, an individual;GOHAR KAZANCHYAN, an individual;AVO KAZANDJIAN, an individual;
LUSINE KHACHATRYAN, an individual;KLARA KHACHATOURIAN, an individual;EMMA
KHACHATRIAN, an individual;JOHNNY KHACHATRIAN, an individual;ARTUR KHACHATRYAN, an
individual;LIANA KHALATIAN, an individual;VAZRIK KHODABERTI, an individual;VARTKEZ
KORHONIAN, an individual;JOHN KOSTIKYAN, an individual;JACK KUPELIAN, an individual;
VAZRIK MADADI, an individual;AIDA MANUKYAN, an individual;POGOS MARTINIAN, an individual;
LENA MESTDJIAN, an individual;NVARD MILITOYSYAN, an individual;RITA MINASSIAN, an
individual;ALFRED MOVSESYAN, an individual;KARAPET MNATSAKANYAN, an individual;GAGIK
NARINYANTS, an individual;GARNIK NAZARYAN, an individual;KARAPET NAZARYAN, an individual;
VARTAN NAZERIAN, an individual;GRIGOR OGANESYAN, an individual;ANZHELIKA OGANIAN, an
individual;TALAR OUNJIAN, an individual;ANNA PETROSYAN, an individual;HAYK PETROSYAN, an
individual;SEVAK PETROSYAN, an individual;MARTIN PILOYAN, an individual;ARMINE POGOSIAN,
an individual;OFELIA POGOSIAN, an individual;SEDRAK POGOSYAN, an individual;RANBAY
CONSTRUCTION, CORP. ;ANAHIT RSHTUNI, an individual;JANET SETAGHAIAN, an individual;
DAVID SHAKHGELDYAN, an individual;ALEXANDER SHAKHNAZARYAN, an individual;SILVIA
SHAPAGATIAN, an individual;KAREN SHIRINIAN, an individual;GEVORK SHIRINIAN, an individual;
ZHIRAYR SIMONYAN, an individual;ELLEN STAMBULYAN, an individual;RAZMIK TEROVSEPIAN,
an individual;MISSAK TOKHMANIAN, an individual;GREG TOMASYAN, an individual;MARINE
TOUFENKCHIAN, an individual;SEVAG TOULOUMDJIAN, an individual;LEVON LEO
UTUDZHYAN, an individual;SUREN VARDANYAN, an individual;HASMIK YENOKYAN, an individual;

Page ___1___ of ___2___

Form Adopted by Rule 982(a)(9)(A)
Judicial Council of California
982(a)(9)(A) [New January 1, 1993]

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

American LegalNet, Inc.
www.USCourtForms.com